**Karl HASSELL, Sr., et al., Plaintiffs,**

v.

**CHRYSLER CORPORATION, et al., Defendants.**

**Nos. C2–94–242, C2–94–747.**

United States District Court, S.D. Ohio, Eastern Division.

March 26, 1997.

James Bernard Blumenstiel, Blumenstiel Huhn Woods Adams & Hemmer, Columbus, OH, for Plaintiffs.

William K. West, John Albert, Brian Beatus, Crabbe Brown Jones Potts & Schmidt, Columbus, OH, for Defendants.

## OPINION AND ORDER

SARGUS, District Judge.

### I.

On March 18, 1994, Plaintiff Karl Hassell, Sr. and Hassell Free Safety Seats, Inc. (hereinafter collectively referred to as "Hassell") filed a seven count complaint against defendants Chrysler Corporation (hereinafter "Chrysler") and Atoma International of America, Inc. (hereinafter "Atoma"). Defendants have moved for Summary Judgment with respect to Counts One through Six and have moved to dismiss Count Seven for lack of jurisdiction.

Count One alleges that on September 10, 1985 Hassel was issued letter Patent Number 4,540,216 (hereinafter the "'216 Patent"), entitled "Convertible Seat for Vehicles." As will be described below, the '216 Patent involves a convertible child's restraining seat built into adult passenger seats. Hassel contends that Chrysler and Atoma have infringed upon the '216 Patent by making, using, or selling built-in child safety seats embodying the patented invention.

Count Two alleges that the defendants have engaged in unfair competition by wrongfully expropriating Hassel's concept for a built-in child safety seat. Count Three asserts that the defendants have engaged in false advertising under 15 U.S.C. § 1125(a), by the alleged mischaracterization of the defendant's product as the "U.S. auto industry's first built-in child car seats."

In Count Four, the plaintiff contends that the defendants have, under 15 U.S. § 1051, *et seq.*, engaged in unfair competition by copying features of the plaintiffs' product and causing confusion as to the origin of the products. Count Five alleges that the defendants have marketed a child safety seat in a deceptive manner, in violation of O.R.C. § 4165.02. Count Six asserts that the defendant, Chrysler, breached a written promise set forth in a letter agreement with plaintiff and dated October 17, 1983.

Finally, in Count Seven of the complaint, plaintiff seeks a declaratory judgment determining whether defendants U.S. Letter Patent No. 5,224,756 (hereinafter the "'756 Patent") is valid, or, whether the same was wrongfully issued in light of the '216 Patent.

In turn, defendants have filed a four count counterclaim against plaintiff. Defendant first seeks a declaratory judgment that they have not infringed upon the '216 Patent, and that the scope of the '216 Patent does not encompass child safety seats covered by the '756 Patent. Defendants also seek a declaratory judgment determining that they did not breach the October 17, 1983 Letter Agreement and that they did not engage in unfair competition. Finally, the defendants seek a declaratory judgment determining that they have not infringed upon any claim under the '216 Patent.

### II.

On September 16, 1983, plaintiffs approached Chrysler for the purpose of interesting the defendant in purchasing and marketing plaintiffs' idea of a built-in child restraining seat. At such time, no U.S. manufacturer of automobiles was marketing a built-in child restraining device. Instead, small children could only be placed in portable child seats which would attach to a motor vehicle by use of a seatbelt. Such portable seats were, and are, bulky, inconvenient, and uncomfortable. Chrysler responded with a proposed letter agreement, captioned "Suggestion Agreement," which plaintiffs signed and returned to Chrysler on October 25, 1985.

The Suggestion Agreement contained a number of disclaimers on the part of Chrysler. First, the agreement stated that, "No suggestion information is received in secrecy or confidence ...". Second, the document states "No obligation of any kind is assumed by, nor may be implied against Chrysler Corporation for any claimed or actual use by it of all or any part of the suggestion ..." Finally, the Suggestion Agreement includes the following:

"I do not hereby give Chrysler Corporation any rights under any patents, trademarks, or copyrights I now here or may later obtain covering my suggestion, but I do hereby in consideration of the examination of my suggestion *release it from any liability in connection with my suggestion*

or liability because of use of any portion thereof *except such liability as may arise under valid patents, trademarks, or copyrights now or hereafter issued or obtained."* [emphasis added]

From October 25, 1983 through January of 1984, plaintiffs had a series of communications with representatives of Chrysler's Outside Suggestion Department. The plaintiffs forwarded to Chrysler photographs and dimensions of the proposed built–in child restraining seat. On February 6, 1984, a Mr. R.E. Springer told plaintiffs that Chrysler was working on "something similar" and that an invitation previously made to the plaintiffs to demonstrate the seat to Chrysler was withdrawn. No further discussions were held as to any business relationships between plaintiffs and defendants.

On July 21, 1983, plaintiffs filed Patent Application No. 515,804 entitled "Convertible Seat for Vehicles." On page 2 of the narrative describing the invention, the plaintiffs note:

"The possibility of storing a child's seat within the normal built–in seats of the automobile has not been overlooked in the past, and various self–storing and/or convertible seats have been proposed although none have apparently met the needs of the using public.... Examples of prior art convertible child's seat for automobiles include U.S. Patent 2,966,201—Strahler, showing a fold out cradle and seat combination. U.S. Patent 2,436,294—Gladstein, reveals another approach to the problem. Other patents of interest include U.S. Patent 2,584,481—Mast et al., 2,337,480—Logan, 3,951,450—Gambotti, and French Patent 2,307,673."

The claims application included nine claims. Claim One involved a convertible seat for a vehicle including the following:

1. A convertible seat for a vehicle comprising:

 a. an adult size seat including a substantially horizontal cushion for support when a person is seated, juxtaposed and meeting a substantially vertical backrest with a back support surface, the backrest having an aperture as an entrance to a cavity therein, with the aperture having a closure fastenable at the surface of the backrest; and

 b. a foldable child's size seat attached to a frame within the cavity including a second cushion attached to the frame and pivotable thereon from a position substantially vertical when folded to a position substantially horizontal when unfolded, the cushion being juxtaposed and meeting a substantially vertical second backrest with a back support surface, the cushion being foldable to a position adjacent to the second rest when in folded position, and an armrest guard encircling the second cushion position when unfolded substantially parallel therewith, attached to and pivotal with the second backrest surface when unfolded, and substantially vertical when folded, the second cushion, armrest and guard being pivotal to the folded position, enclosable in the cavity, and covered by the closure means.

Claims Two through Nine incorporate a seat according to Claim One, and are therefore dependent claims based upon Claim One. Claims Two through Nine vary the design of Claim One by use of additional padding (Claim Two), zipper (Claim Three), safety belt (Claim Four). Claim Five adds the variation of folding the armrest and guard to a position encircling the top of the second backrest in the folded position. Claim Six involves an additional headrest component. Claim Seven includes connectable seatbelts constructed to encircle the lap of the child with the same being foldable within the enclosure. Claim Eight adds shoulder belts, while Claim Nine contains an adjustable, retractable headrest.

On October 17, 1984, a primary examiner for the Patent and Trademark Office ("PTO") rejected the Patent Application No. 515,804 on the basis of obviousness. The examiner found:

"Claims 1–7 and 9 are rejected under 35 U.S.C. § 103 as being unpatentable over *Bernier* in view of *Smith* and *Looney*. To use a foldable seat of the type shown by

Smith with Bernier's car seat cavity would be obvious....

Claim 8 is rejected ... To provide the seat with a shoulder belt or belts, as suggested by Hime would be obvious." (Def.Ex. 5, p. 20)

The examiner cited seven previously issued patents as including prior art which established obviousness under 35 U.S.C. § 103. At least three of the seven patents involved various types of built–in automotive child seats. These three patents were issued in 1942 (No. 2,294,039, Looney), in 1960 (No. 2,966,201, Strahler), and 1963 (No. 3,094,354, Bernier).

In response, on January 16, 1985, the plaintiffs filed an Amendment to the original application. The plaintiffs also asserted that:

"the prior art does not show an operative having a closure means fastenable at the surface of the backrest ... Further, the prior art does not show a second cushion and arm rest guard being pivotal, enclosed in a cavity in an adult seat and covered by a closure means in the folded position." (Def.Ex. 5, p. 51)

Further, the plaintiff claims:

"... none of the references have a construction wherein the armrest guard is foldable to a position encircling the top of the second backrest in the folded position ..."

The plaintiffs made several modifications to the precise language of Claim 1, including the insertion of the fact that the seat is constructed on the main frame which is in turn attached to the vehicle itself. Other language was inserted in paragraph 2 of Claim 1 to include references to the position of the folded seat within the cavity and to show that the armrest is pivotal and enclosed in the cavity.

On March 28, 1985, the PTO issued a Notice of Allowability indicating that Claims 1 through 9 were allowed in view of the amendments and comments filed by plaintiffs on January 16, 1985. Consequently, the '216 Patent was issued to plaintiffs on September 10, 1985 and included the following claims:

1. (Amended) A convertible seat for a vehicle comprising:

a. an adult size seat *constructed on a main frame that is attached to the vehicle* including a substantially horizontal cushion for support when a person is seated, juxtaposed and meeting a substantially vertical backrest with a back support *surface,* the back (rest) *support surface* having an aperture as an entrance to a cavity therein, with the aperture having a closure *means* fastenable at the surface of the backrest; and

b. a foldable child's size seat attached to [a] *the main frame* within the cavity including a second cushion attached to the *main* frame and pivotable thereon from a position substantially vertical *within the cavity* when folded to a position substantially horizontal when unfolded *within and* outside the cavity, *the cushion being* juxtaposed and meeting a substantially vertical second backrest with a back support surface *attached to the main frame,* the cushion being foldable to a position adjacent to the second *back* rest when in folded position, and

an armrest guard encircling the second cushion position when unfolded substantially parallel therewith, attached to and pivotal [with] *from* the second backrest surface when unfolded, and substantially vertical when folded,

the second cushion [,] *and* armrest [and] guard being pivotal [to the folded position enclosable], *enclosed* in the cavity, and covered by the closure means, *in the folded position.*

Not until October 29, 1990 did the plaintiffs' integrated child–car seat meet the then existing Federal Motor Vehicle Safety Standard 208. Thereafter, on November 26, 1990, plaintiffs made their first sale of the built–in seats. In February of 1991 however, the National Highway Traffic Safety Administration proposed amending Standard 208. Until such amendments were made final, further sales by plaintiff were placed on hold. The final changes to Standard 208 caused plaintiffs to redesign their product, which prevented marketing of the seats until early 1992.

In February of 1991, however, Chrysler announced that it was about to begin sales of minivans with an integrated child seat. The defendants claimed in accompanying advertising that the newly designed minivan contained the "U.S. auto industry's first built–in car seat." (Def.Ex. 19–24). By August of 1991, Chrysler was actually selling, through its dealerships, minivans which contained the integrated child restraint seat.

On July 6, 1993, seven individuals were issued Patent Number 5,224,756 (the '756 Patent) and the same was subsequently assigned to the defendants. The claims set forth in the '756 Patent include, *inter alia,* a built–in child restraining seat utilizing as a closure means only an oversized cushion which is capable of snug insertion in and out of the bench seat, together with a five point safety belt harness. The '756 Patent does not reference or include an armrest guard, nor does it reference or include a zipper or other closure device fastened at the surface of the adult seat.

### III.

The defendants have moved for a dismissal of Count Seven of the complaint in which the plaintiffs have sought a declaratory judgment determining that the plaintiffs' product does not infringe upon defendants '756 Patent. Plaintiffs allege in Count 7 that they have been threatened by defendants with legal action as to the claimed infringement.

In defendants' Memorandum in Support of the Motion to Dismiss, defendants now affirmatively state that no action against the plaintiffs is currently planned or intended with respect to an alleged infringement of the '756 Patent. The defendants assert that in the absence of an actual controversy, this Court lacks jurisdiction over Count 7.

The defendants' motion with respect to Count 7 is well taken. Based upon the defendants statement that no legal action is currently planned or intended with respect to an alleged infringement of the '756 claim, Count 7 is dismissed.

### IV.

Defendants have also filed a motion for summary judgment with respect to Counts 1 through 6. In addition to the matters set forth in Part I herein, the defendants have also submitted two affidavits. The first is from Jeffrey Lambert, one of the inventors on the '756 Patent.

Lambert, an engineer, avers that the design of the child's seat in the '756 Patent is not based upon the '216 Patent nor did the '216 Patent influence the design and development of the '756 Patent. Lambert also claims that the '756 Patent contains no rigid structure, similar to the armrest in the '216 Patent, that would encircle a child or that could be used as an armrest. Further, rather than use an armrest guard to restrain a child, the '756 Patent uses a five point harness to prevent injury during a crash.

Lambert avers that the armrest guard is itself hard enough to cause injury to a child and, further, that a group known as Physicians for Alternative Safety were concerned that such an armrest could inappropriately discourage parents from using a safer seatbelt restraint system. The five point harness system of the '756 Patent is not overlapped by an armrest guard encircling the child.

Lambert further describes the method by which the '756 child seat fits into the aperture contained in the adult seats. The child's seat cushion is oversized. The friction between the aperture in the adult seat and the child's seat cushion keeps the child seat in a vertical position, until ready for use by a child. By contrast, the '216 patent includes a zipper or other surface closure device.

Defendants also submitted the affidavit of Ronald S. Zarowitz, another inventor of the '756 Patent. Zarowitz avers that he began work on the patent design in May of 1982. He went to work for Chrysler in 1985. Zarowitz also stated that he had no knowledge of the '216 Patent until 1994.

Plaintiffs have responded to defendants' Motion for Summary Judgment with a series of exhibits and supporting affidavits, and supplemental affidavits from Karl D. Hassell, Sr., Karl D. Hassell, Jr., Jerome Koziatek, Michael Harmon, and Paul MacIntyre.

Karl D. Hassel, Sr., the inventor of the '216 Patent, describes his conception and development of the device. He claims that the idea did not include any mention of restraining devices because "that was not the concern." Instead, "the concept was the integrated aspect of the child seat folding into the back of the adult seat ..." (Affidavit of Karl D. Hassell, Sr. at 9) Hassell concludes that the defendants' product includes only insubstantial changes and is otherwise interchangeable with the integrated child's seat which he invented and patented.

Karl D. Hassell, Jr. is now the president of the plaintiff corporation. His affidavit corroborates many of the matters set forth in his father's affidavit. He, too, concludes that the integrated child's seat in the Chrysler minivan is interchangeable with the device described in the '216 Patent and contains only insubstantial changes.

The plaintiffs have submitted an affidavit from a well–qualified professional engineer, Jerome Koziatek, who has worked on processing and obtaining patents on child–related products. Koziatek avers that the '216 Patent was "new and novel" and was "the first of a kind" to insert a child restraining device into an adult seat affixed to the main frame.

Koziatek opined that the zipper or other closure device set forth in the '216 Patent is functionally the same as the pressure fit closure used in the Chrysler product. Koziatek also concludes that Chrysler's five point harness system is "an obvious extension of the three-point harness and armrest guard system depicted in '216." (Affidavit of Jerome Koziatek at 36) Finally, Koziatek, without any asserted first–hand knowledge, claims that Zarowitz' statement that he had no knowledge of the '216 Patent until 1994 to be "incredible." He makes the same assertion with respect to Chrysler's claim that the Outside Suggestion Department kept no records on the Hassell invention or the '216 Patent. Koziatek never worked for Chrysler and offers no basis for either of these claims.

Michael D. Harmon began a business known as Classic Interiors. The company manufactures and sells seats for conversion vans and specialty autos. Harmon became aware of the plaintiffs product in mid–1989. Harmon claims that the "new and novel" aspect of the device was the built–in quality of the seat. (Affidavit of Michael D. Harmon at para. 8) According to Harmon, the closure device was not the novelty of the device.

Harmon began marketing the plaintiffs product in August of 1990. While initial market reaction was favorable, the entry of Chrysler into the product line prevented the expansion of sales by the plaintiffs.

Paul MacIntyre, a sales representative for various automotive suppliers, became the exclusive sales representative for the plaintiff corporation in early 1990. MacIntyre avers, without an adequate legal foundation, that in the absence of the entry of Chrysler and Atoma into the integrated child seat market, he would have been able to sell the plaintiffs' product to General Motors.

## V.

The procedure for granting summary judgment is set forth in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also*

*Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2514). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## VI.

### A. *The Law of Infringement*

Title 35 U.S.C. § 271(a) provides:

1. A patent includes one or more "claims" which, under 35 U.S.C. § 112, particularly point out and distinctively claim the "subject matter which the applicant regards as his invention." The claim, as used in patent law, actually defines the scope of a patent grant. H. Schwartz, Patent Law and Practice 1, 82 (2d Ed.1995).

2. Patent specifications define the invention "in such full, clear, concise, and exact terms as to

"Whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States ... during the term of the patent ... infringes the patent."

The determination of infringement is a two–step process. First, the Court interprets the claim[1] to determine its scope and meaning; second, the Court determines whether the accused device is within the scope of the properly construed claim. *Dolly, Inc. v. Spalding & Evenflo Companies*, 16 F.3d 394 (Fed.Cir.1994). The plaintiff bears the burden of proving infringement. *Hughes Aircraft v. United States*, 717 F.2d 1351 (Fed.Cir.1983).

The Supreme Court recently held that the construction of the patent, including terms of art within the claim, is exclusively a question of law, to be determined by the Court, rather than a jury. *Markman v. Westview Instruments*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In interpreting the claims of a patent, the Court must consider the precise language of the claim, the patent specifications,[2] other claims, and the prosecution history.

■ The prosecution history may be an important consideration in the construction of claims. The history consists of the public record of proceedings before the Patent and Trademark Office. An applicant for a patent may surrender certain claims during the prosecution of his or her patent application. The doctrine of prosecution history estoppel prevents a plaintiff from asserting claims or equivalents which would recapture subject matters surrendered during prosecution of the patent application. *Haynes International Inc. v. Jessop Steel Co.*, 8 F.3d 1573 (Fed. Cir.1993). Prosecution history may not, however, be used to enlarge, diminish, or vary

enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112. Patent specifications are more detailed and expansive than "claims." While the claim actually defines the scope of the patent grant, the patent specifications act as a "sort of dictionary, which explains the invention." *Markman v. Westview Instruments*, 52 F.3d 967, 979 (Fed.Cir.1995); affd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

the limitations set forth in the claims. *Markman v. Westview Instruments,* 52 F.3d 967, 980 (Fed.Cir.1995).

The Court may also consider extrinsic evidence if the same is helpful in discerning the meaning of scientific or technical terms or principles. *Id.* Such evidence may include expert and inventor testimony.

As explained by the Court of Appeals in *Markman:*

> "When, after considering the extrinsic evidence, the court finally arrives at an understanding of the language as used in the patent and prosecution history, the court must then pronounce as a matter of law the meaning of that language."

*Markman,* 52 F.3d at 981. After the claim is thus construed, the second prong of the infringement analysis, whether the accused device infringes upon the construed claim, becomes a question of fact, subject to summary judgment analysis, testing whether the record discloses a genuine issue of material fact.

## B. *Construction of the Claims*

■ The essence of the dispute between the parties is whether the claims of the plaintiffs are construed to limit the patent grant to devices using a closure device fastenable at the surface of the backrest or equivalents, and, whether the claims are construed to require an armrest guard, or equivalents. Both of those disputed matters are within the scope of claim construction.

The plaintiffs' patent includes nine claims, with Claims Two through Nine dependent upon Claim One. Claim One includes a convertible seat including an adult size seat with a horizontal cushion for support, with the back support surface "having an aperture as an entrance to a cavity therein, with the operative having a *closure means fastenable at the surface* of the backrest." [emphasis added]. Claim One also includes "an armrest guard encircling the second cushion position when unfolded substantially parallel therewith ... and substantially vertical when folded."

The plaintiffs assert that the novelty of its claims are not dependent upon either the closure device (the method by which the smaller child's seat fits into the adult–sized seat) or the armrest. Relying upon the affidavit of Jerome Koziatek, the plaintiffs assert that the "new and novel" aspect of the '216 Patent is the integration of a child seat into an adult seat.

The language of the claim itself, the prosecution history, and the prior art all refute the plaintiffs position. No fewer than three patents were issued prior to the '216 Patent which described various types of built–in automotive child seats. Previously issued patents clearly show an integrated child seat built into an adult size seat. The Bernier Patent (No. 3,094,354), for example, issued in 1963, shows one integrated child's seat which is pulled down from the back of an adult seat. (Appendix A) The same is true with respect to the Strahler Patent (No. 2,966,201) which describes an adult automotive seat which contains a built–in integrated pull down child's seat. (Appendix B)

Further, in the "Background of Invention" accompanying the '216 Patent, it is expressly noted that "[t]he possibility of storing a child's seat within the normal built–in seats of the automobile has not been overlooked in the past ..." (Def. Ex. 1, column 1, lines 39–43) The plaintiffs themselves admitted as much when, in response to the initial patent application, an amendment was submitted which noted that "the prior art does not show an aperture having a closure means fastenable at the surface of the backrest ..." (Def.Ex. 5, p. 51)

Moreover, the plaintiffs noted to the PTO in their amended filing that "... none of the references [to prior patents] have a construction wherein the armrest is foldable to a position encircling the top of the second backrest in the folded position." (Def.Ex. 5, p. 51) Only after the plaintiffs submitted such limiting descriptions of the invention did the patent actually issue.

In this case, the precise language of the claim, the state of the prior patents, the prosecutive history of the original application, and the specifications of the claim, all dovetail in the process of construing the claim. Claim One clearly references an aperture having a closure means *fastenable at the surface.* The claim does not limit the precise

closure means. The claim therefore includes snaps, zippers, buttons, and similar devices *fastenable at the surface.*[3]

Other methods, such as an oversized cushion placed and maintained in the aperture through friction, are not fastenable at the surface but are instead held in place by pressure between the inserted cushion and the permanently placed surrounding seat cushion. Such pressure is asserted between the two at all points *except* the surface of the child's seat and the adult seat.

Claim One also includes specific reference to an armrest. The claim refers to an armrest which is substantially vertical when folded into the adult seat and substantially parallel to the child's seat when deployed. The armrest is described as "encircling the second cushion position when unfolded."

Under the heading "Background of the Invention," the patent document itself refers to "a secure guard encircling the child's upper body, a guard to receive the impact of the child's face in the event of a rapid deceleration." (Def. Ex. 1, column 1, lines 30–32) Further, in the description of the invention, it is noted that, "[t]he armrest as it passes around the upper torso of the child serves as a guard for the descending face of the child if it [sic] should be thrown forward." (Def. Ex. 1, column 3, lines 18–21)

With respect to the elements of the claim at issue in this case, the Court construes the '216 Patent to require (1) a closure device fastenable at the surface which, through use of a zipper, buttons, hooks, or similar device, physically connects the surface of the backrest to the surface of the second cushion used as the foldable child's seat, and (2) an armrest guard which folds down from a vertical position and encircles the child, once such child is placed in the pulled down seat.

C. *Comparison of the Construed Claim to the Accused Device*

 The determination of whether an accused device infringes upon a construed claim is one of fact, triable by jury. *Markman v. Westview Instruments,* 52 F.3d 967

(Fed.Cir.1995). At the same time, Rule 56 applies with equal force to the issues otherwise the subject of a trial by jury. The defendants assert that there is no genuine issue of material fact and that they are entitled to summary judgment, as a matter of law.

An accused device infringes upon a claim ". . . if the device embodies every limitation of the claim, either literally or by an equivalent." *Carroll Touch Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576 (Fed. Cir.1993). A literal infringement occurs only when the accused device contains every limitation of the patent claim. If that is the case, literal infringement is established and the analysis is complete.

An accused device may also infringe on a patent claim under the doctrine of equivalents. *Graver Tank & Manufacturing Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). As described in *Dolly, Inc. v. Spalding & Evenflo Companies:*

> "An accused device may infringe a claim under the doctrine of equivalents if it performs substantially the same overall function or work, in substantially the same way, to produce substantially the same overall result of the claimed invention."

*Dolly, Inc. v. Spalding & Evenflo Companies,* 16 F.3d at 397.

Further, the Court noted:

> "To be a[n] . . . 'equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." (citations omitted)

*Id.*

Finally, the doctrine of equivalents cannot extend or expand the scope of the claim. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677 (Fed.Cir.1990).

The Supreme Court recently reaffirmed and clarified the doctrine of equivalents in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* —— U.S. ——, 117 S.Ct. 1040,

---

**3.** "Closure" is defined in Webster's Dictionary, Third Edition, as "(1) a means of enclosure, (2) the action of confining . . . in an enclosed place . . ."

137 L.Ed.2d 146 (1997). The Supreme Court refused to overturn *Graver Tank, supra,* while explaining:

"Today we adhere to the doctrine of equivalents. The determination of equivalence should be applied as an objective inquiry on an element–by–element basis. Prosecution history estoppel continues to be available as a defense to infringement, but if the patent-holder demonstrates that an amendment required during prosecution had a purpose unrelated to patentability, a court must consider that purpose in order to decide whether an estoppel is precluded." *Hilton Davis,* at ——, 117 S.Ct. at 1044.

Applying those principles to the case at law, the Court finds no genuine issue as to any material fact with respect to the claimed infringement. No reasonable trier of fact could conclude that the accused device literally infringes upon the patented product. With respect to the closure device, the Court finds that the '216 Patent includes a closure device which does not include or encompass the method by which the defendants' integrated child seat folds into the adult backrest. The accused device does not have a closure device which fastens at the surface of the adult seat. In addition, the '216 Patent includes an armrest and armrest guard. The defendants' product does not make use of an armrest or an armrest guard.

The Court also finds that the plaintiffs' claim fails under the doctrine of equivalents. Under the analysis in *Hilton Davis,* set forth above, the Court finds that the plaintiffs amended their original patent application for the precise reason of giving up claims in order to achieve patentability.

The friction method used by defendants to enclose the oversized child seat into the adult seat does not substantially perform the same function as a closure device fastenable at the surface. The friction method does not work in the same way as a surface closure device and does not produce the same overall result.

A closure device utilizing fasteners of various kinds on the surface of the two interfacing cushions is vastly different from a fold–in, friction based method. The surface based closure device seals off the inserted pillow and requires an additional step in redeploying the child seat (e.g., unzipping, then folding down the seat). The friction method employed with an oversized cushion requires a one–step, pull–down deployment. Fasteners on the surface—such as zippers or snaps—may also become depositories for food (not unpredictable in the case of a child's seat), drinks, rust, or other matter which could hamper ease of use. This potentially negative feature is not present in the accused device.

The accused device contains no encircling armrest or armrest guard, but instead uses a five point harness system. The system involves two shoulder straps, two waist straps, all connected to a fifth strap extending from the bottom of the seat and located between the legs of the child placed in the device.

For several reasons, the Court finds that no reasonable trier of fact could conclude that the five point harness system is the equivalent of the armrest and armrest guard described in the '216 Patent. First, defendants' product does not include any mention of an armrest. Therefore, the functions are not the same. The two devices to be compared do not perform in the "same way." Plaintiffs' device encircles a child, with a rigid device, without the necessity of an affixed seatbelt. Defendants' seat contains no fixed device but secures the child by use of what is essentially a five point seatbelt.

Finally, the Court notes that the two devices provide vastly differing degrees of potential safety to a child placed in an integrated, pull–down seat. The five point harness securely encompasses the child and prevents excessive movement, particularly during a crash. It is obvious that the child seat has no utility without use of the five point harness, since no other method would keep a young child in the seat.

By contrast, the '216 Patent product has the potential to encourage placement of the child within the encircling armrest without use of a seatbelt. The armrest could potentially keep a child in the seat, without providing the much greater degree of safety from use of a seatbelt or shoulder harness. This concern has been voiced by both the National

Highway Traffic Safety Administration and Physicians for Automotive Safety. (Def. Ex. 30, at 72.135, col. 2; Def. Ex. 31, p. 2)

The Court concludes, pursuant to Fed. R.Civ.P. 56, that there is no genuine issue as to any material fact with respect to plaintiffs' claim of patent infringement in Count One.

## VII.

Count Two of the Complaint accuses defendants of unfair trade practices.[4] Count Three of the Complaint asserts that the defendants have engaged in false advertising in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, while Count Four alleged violation of the same act based upon a claim of confusion as to source or origin.

The Lanham Act provides two separate bases of liability. Title 15 U.S.C. § 1125(a)(1) imposes civil liability upon any party using words or terms which

"(A) is likely to cause confusion . . . or to deceive as to the . . . origin . . . of . . . goods, or

(B) misrepresents the nature . . . of his or her or another's goods . . ."·

Counts Two, Three, and Four collectively allege that the defendants wrongfully obtained plaintiffs' concept for a built–in child seat, falsely advertised that the defendants were first in the auto industry to produce such device, wrongfully confused the public as to the origins of defendants' products, excluded plaintiffs from obtaining contracts with other auto manufacturers, and used Atoma to interfere with the marketing of plaintiffs' car seat design.

Count Five of the Complaint asserts an action under the Ohio Deceptive Sales Practices Act, O.R.C. § 4165.02. Ohio Courts have applied the Lanham Act analysis in cases arising under this statute. *Cesare v. Work,* 36 Ohio App.3d 26, 520 N.E.2d 586 (1987), *see also Worthington Foods v. Kellogg,* 732 F.Supp. 1417 (S.D.Ohio 1990). Consequently, Counts Two, Three, Four and Five will be considered collectively.

Initially, the claim that Chrysler wrongfully obtained the plaintiffs' concept for a built–in child seat is based upon an alleged contractual breach of confidentiality arising from the parties' dealings in 1983 and 1984. This claim necessarily involves a determination of the contractual rights of the parties and will be addressed below with reference to Claim Six of the Complaint. As will also be discussed below, the contract between Hassell and Chrysler, dated October 25, 1983, precludes any liability on the part of Chrysler for any knowledge or use of information supplied by Hassell, unless Chrysler actually infringes upon a copyright. Consequently, the defendants cannot maintain any action under Counts Two, Three, and Four based upon an alleged wrongful obtaining and use of the '216 Patent or prior designs submitted to Chrysler by Hassell.

■ The plaintiffs allege that Chrysler falsely advertised that it was marketing "the U.S. auto industry's first built–in car seat." (Complaint, para.37.) The plaintiffs' do not contend that any other U.S. auto manufacturer ever offered built–in child seats on newly manufactured vehicles. The plaintiff has not offered evidence that the claim is false. While plaintiffs may argue that the Hassell device predated Chrysler's, it is not a strained or unreasonable interpretation of the statement by Chrysler that it was the first U.S. manufacturer of automobiles to offer a built–in car seat. To hold otherwise would subject every advertising claim to an exhaustive dissection that would explore every possible inference or interpretation of a sales promotion.

To establish a Lanham Act claim of false advertising, the plaintiffs must establish all five of the following elements:

(1)· The statements must be false;

(2) The statements must deceive or have a tendency to deceive a substantial segment of the audience;

(3) Such deception must be material;

---

4. Count Two of the Complaint does not specifically plead the Lanham Act. 15 U.S.C. § 1051, *et seq.* The paragraphs of Count 4 do, however, state a claim under such Act and the Court considers Count 2 as if the statute had been referenced.

(4) The defendant must cause its falsely advertised goods to enter interstate commerce;

(5) As a result of false advertising, the plaintiffs must suffer diversion of sales or loss of goodwill.

*Cook, Perkiss, Liehe v. N.C. Collection Service,* 911 F.2d 242 (9th Cir.1990). Because the statement complained of was true, the plaintiffs have failed to meet elements (1), (2), (3), and (5).

■ Plaintiffs also claim that defendants have violated the Lanham Act by engaging in "false association" under 15 U.S.C. § 1125(a)(1)(B). The necessary elements of a claim under this section include:

(1) Defendants have used, in interstate commerce, a designation in connection with the integrated child's seat;

(2) The designation is likely to cause confusion and mistake, or deception as to

(a) the affiliation or association of defendants with another person; or

(b) the origin or approval of defendant's product by another person.

(3) Plaintiffs have been injured, or are likely to be injured, as a result of the foregoing.

*KeyStone Retaining Wall Sys. v. Westrock,* 997 F.2d 1444 (Fed.Cir.1993).

From the uncontradicted evidence of record, plaintiffs' product did not acquire any secondary meaning before defendants entered the market through the sale of minivans with built–in child seats commencing with a sales promotion on May 15, 1991. When Chrysler began actually marketing such vehicles in August of 1991, plaintiff had sold only 215 seats in a national market with all other orders put on hold in February of 1991 (due to a proposed amendment of FMVSS Standard 208 regulating child restraining seats). Additional orders were not filled until February of 1992, *after* Chrysler had entered the market.

Further, plaintiffs' product, while unique, is not inherently distinctive with respect to built–in child seats (see discussion of prior patents, pp. 16, 17 herein). Even if plaintiff could establish such a status for its childseat,

the Lanham Act would still not protect "functional features" of a product. To do so would "provide a perpetual monopoly of features, which could not be patented." *Esercizio v. Roberts,* 944 F.2d 1235, 1246 (6th Cir.1991). A products' feature is functional "if it is essential to the use or purpose of the article …" *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 2187, 72 L.Ed.2d 606 (1982).

The plaintiffs have marketed their product solely on the basis of its usefulness and convenience. The advertising of the products emphasizes only its function and not any alleged trade dress which could otherwise be protected.

Finally, plaintiffs assert that Chrysler used Atoma to interfere with the marketing of plaintiffs' car seat. Initially, the Court finds that this claim is dependent on the other allegations made by plaintiffs under the Lanham Act. Obviously, Chrysler was free to enter into a business relationship with Atoma to market car seats without violating the Lanham Act. Only if such relationship was based upon misrepresentations, false advertising, or false association is a viable claim asserted under the Lanham Act.

Having addressed all of such claims alleged by plaintiffs and found them to be insufficient to raise a material issue of fact under Rule 56 of the Federal Rules of Civil Procedure, the Court finds that the allegations claiming interference by Chrysler and Atoma to be without legal foundation. Finally, the Court also notes that the plaintiffs have not produced any evidence sufficient under Rule 56(e), requiring personal knowledge of the asserted facts, to provide any factual basis for the alleged interference by Chrysler and Atoma.

The Court concludes that defendants are entitled to Summary Judgment as to Counts Two, Three, Four and Five of the Complaint.

## VIII.

■ Plaintiffs also allege that Chrysler breached its contract with Karl D. Hassell, Sr. by wrongfully using Hassell's intellectual property in the design and development of the built–in car seat. Paragraph 48 of the

Complaint refers to the "Suggestion Agreement" as forming a contractual relationship between Hassell and Chrysler, with the same being allegedly breached by Chrysler's later use of Hassell's intellectual property.

After Hassell wrote to Chrysler in September of 1983 and sought to market his product with the company, Chrysler responded with a proposed "Suggestion Agreement" which Hassell signed and returned. (Pl.Ex. 13, p. 2) There is no question that the execution of the Suggestion Agreement constituted the formation of a binding contract between Hassell and Chrysler.

The plaintiffs argue strenuously, however, that the language of the Suggestion Agreement should be disregarded by the Court. The Agreement quite specifically recites:

"I [Hassell] wish to submit a suggestion for the consideration of the Chrysler Corporation ... I understand ... you have established a uniform policy ... The policy requires that I accept the following specific considerations before consideration of my suggestion:

1. No suggestion information is received in secrecy or confidence ...

2. No obligation of any kind is assumed by, nor may be implied against Chrysler Corporation for any claimed or actual use by it of all or any part of the suggestion ...

3. I do not hereby give Chrysler Corporation any rights under any patents ... I may now have or later obtain covering my suggestion, but I do hereby in consideration of the examination of my suggestion *release it from any liability in connection with my suggestion or liability because of use of any portion thereof except such liability as may arise under valid patents. trademarks. or copyrights now or hereafter issued or obtained.*"

(Pl.Ex. 13, p. 2) [emphasis added].

Plaintiffs site the Court to the case of *Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir.1985) for the proposition that the effect of a disclosure agreement is to be determined by a jury unless the agreement is so clear that its terms can be determined as a matter of law. (Plaintiffs' Memoranda Contra, p. 45). The *Burten* decision also makes clear, however, that expressed, unambiguous waivers operate to negate the creation of an implied confidential relationship. The case also holds that explicit waivers bar recovery for misappropriation of trade secrets.

The language cited above is unambiguous. Chrysler may not be liable for any claim, other than those arising under patent, copyright, or trademark infringement. Plaintiff knew of such language and no evidence has been presented that Hassell did not voluntarily sign the Suggestion Agreement. While the Suggestion Agreement contains exculpatory language which is not necessarily favored in the law (see Restatement of Contracts, Second, §§ 195, 196 (1981)), the contract still clearly protects any valid patent, copyright or trademark of Hassell and does not permit Chrysler to infringe upon the invention.

The Court concludes that the language contained in the Suggestion Agreement is susceptible of only one interpretation. The plaintiffs may only bring claims against Chrysler resulting from patent, copyright or trademark infringement. Having determined, *infra*, that claims for infringement must be denied under Rule 56, any contractual claims which must be promised upon infringement, is also subject to summary judgment in favor of the defendants.

## IX.

Based upon the foregoing, summary judgment is hereby rendered in favor of the defendants. Defendants' Motion (Doc. 38) is **GRANTED** and this case is **DISMISSED** with prejudice. The Clerk shall remove this case from the Court's pending cases list.

APPENDIX A

297-112 *p/9/*

SEARCH ROOM

5/99R

June 18, 1963

R. J. BERNIER

3,094,354

CAR SEAT ASSEMBLY

Filed April 16, 1962

2 Sheets—Sheet 1

Fig. 1

Fig. 2

Fig. 3

Roland J. Bernier

INVENTOR

BY

APPENDIX B

297-238

SEARCH ROOM

Dec. 27, 1960 L. W. STRAHLER 2,966,201

AUTOMOBILE SEAT AND CRADLE

Filed April 10, 1959

INVENTOR
Louis W. Strahler
BY

McMorrow, Berman + Davidson
ATTORNEYS